# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| IN RE WEWORK LITIGATION | ) <br> ) Consolidated <br> ) C.A. No. 2020-0258-AGB <br> ) |

## MEMORANDUM OPINION

Date Submitted: July 21, 2020
Date Decided: October 30, 2020

William M. Lafferty, Kevin M. Coen, Sabrina M. Hendershot, and Sara Toscano, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, Delaware; Eric Seiler, Philippe Adler, and Mala Ahuja Harker, FRIEDMAN KAPLAN SEILER & ADELMAN LLP, New York, New York; William Christopher Carmody, Shawn J. Rabin, and Arun Subramanian, SUSMAN GODFREY L.L.P., New York, New York; *Attorneys for Plaintiffs Adam Neumann and We Holdings LLC*.

William B. Chandler, III, Brad D. Sorrels, Lori W. Will, Lindsay Kwoka Faccenda, Leah E. Brenner, and Jeremy W. Gagas, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; David J. Berger, Steven M. Guggenheim, and Dylan G. Savage, WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; Michael S. Sommer, WILSON SONSINI GOODRICH & ROSATI, P.C., New York, New York; *Attorneys for the Special Committee of the Board of Directors of The We Company*.

Robert S. Saunders, Sarah R. Martin, and Arthur R. Bookout, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; George A. Zimmerman, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York; *Attorneys for The We Company*.

Elena C. Norman, Rolin P. Bissell, and Nicholas J. Rohrer, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Erik J. Olson, MORRISON & FOERSTER LLP, Palo Alto, California; James Bennett and Jordan Eth, MORRISON & FOERSTER LLP, San Francisco, California; *Attorneys for Defendant SoftBank Group Corp.*

Michael A. Barlow and E. Wade Houston, ABRAMS & BAYLISS LLP, Wilmington, Delaware; John B. Quinn and Molly Stephens, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, California; *Attorneys for Defendant SoftBank Vision Fund (AIV M1) L.P.*

**BOUCHARD, Chancellor**

This case concerns a transformative transaction involving The We Company, a privately-held global real estate company specializing in shared workspaces, commonly known as WeWork. In October 2019, after the well-publicized failure of its initial public offering, the Company was facing a liquidity crisis.

On October 22, 2019, the Company, Adam Neumann, We Holdings LLC, SoftBank Group ("SBG"), and SoftBank Vision Fund (AIV MI) L.P. ("Vision Fund" or "SBVF") entered into a Master Transaction Agreement (the "MTA"). The MTA was designed to provide funding to the Company, facilitate Neumann's exit as the Company's CEO, and provide liquidity to Neumann and the minority stockholders of the Company. More specifically, the MTA obligated SBG to do three things in the following order: (i) provide the Company with $1.5 billion of equity financing, (ii) purchase up to $3 billion of the Company's stock from Neumann and other stockholders in a tender offer, and (iii) provide the Company with up to $5.05 billion of debt financing. The closing of the tender offer was subject to certain conditions, including the roll-up of a joint venture known as ChinaCo. The parties to the MTA were obligated to use their reasonable best efforts to complete this roll-up.

The tender offer began on November 22, 2019 and became oversubscribed. Over 90% of the shares eligible to tender did so.

1

On December 27, 2019, the Company, SBG, and Vision Fund approved an amendment to the MTA to allow the debt financing to commence before the tender offer closed. Neumann was asked, but refused to consent to this amendment. Around this time, SBG proceeded with the debt financing even though the tender offer had not closed. Also around this time, SBG and Vision Fund together held more than 52% of the Company's equity on a fully-diluted basis and had the right to designate one half of the members of its board of directors, which held a proxy to vote Neumann's super-voting founder shares

On April 1, 2020, SBG terminated the tender offer, asserting that certain closing conditions to the tender offer—in particular the roll-up of ChinaCo—were not satisfied. Two lawsuits quickly followed.

A special committee of two directors who negotiated the MTA on behalf of the Company filed the first case, asserting claims in the Company's name against SBG and Vision Fund for breach of the MTA and breach of fiduciary duty as controlling stockholders. Neumann filed the second case, asserting similar claims. The court consolidated these actions, but maintained separate pleadings for the two plaintiffs. SGB and Vision Fund each filed partial motions to dismiss both complaints.

2

This opinion concerns the motions to dismiss the Neumann complaint. Vision Fund, but not SBG, seeks to dismiss the contract claim against it. Both SBG and Vision Fund seek to dismiss the fiduciary duty claim.

For the reasons explained below, the court denies Vision Fund's motion to dismiss the contract claim, except as to one provision that is inconsequential to the gravamen of Neumann's contract claim, and grants SBG and Vision Fund's motion to dismiss the fiduciary duty claim because that claim is entirely duplicative of the contract claims asserted against them.

## I. BACKGROUND

Unless otherwise noted, the facts recited in this opinion come from the First Amended Verified Complaint (the "Complaint") and documents incorporated therein. Any additional facts are subject to judicial notice.

### A. The Parties

Plaintiffs in this case are Adam Neumann and We Holdings LLC, a Delaware limited liability company of which Mr. Neumann is a managing member.[1] For simplicity, this case refers to Adam Neumann and We Holdings together either as "Plaintiffs" or "Neumann" and, when referring to Adam Neumann individually, as Mr. Neumann. Mr. Neumann co-founded The We Company (the "Company" or

---

[1] Verified Am. Compl. ("Compl.") ¶ 89 (Dkt. 131).

"WeWork") and served as its Chief Executive Officer from its inception until September 2019.[2]

Defendant SoftBank Group Corp. is a corporation incorporated under the laws of Japan and headquartered in Tokyo, Japan.[3] Masayoshi Son founded SBG's predecessor in 1981 and serves as SBG's Chairman and Chief Executive Officer.[4] As of October 30, 2019, SBG owned 31% of WeWork's equity, on a fully diluted basis.[5]

Defendant SoftBank Vision Fund (AIV M1) L.P., a Delaware limited partnership, was founded by Son.[6] Vision Fund is a venture capital fund that frequently invests in tandem with SBG, as it did in the case of WeWork.[7] As of October 30, 2019, Vision Fund owned 11% of WeWork's equity, on a fully diluted basis.[8] Vision Fund has received more than $30 billion in investments from SBG, Son, and other SBG executives.[9] SBG and Vision Fund issue consolidated financial

---

[2] *Id.* ¶¶ 8, 25.

[3] *Id.* ¶ 10.

[4] *Id.*

[5] *Id.*

[6] *Id.* ¶ 12.

[7] *Id.*

[8] *Id.*

[9] *Id.* ¶ 15.

statements, which jointly describe their investments in WeWork.[10]  Vision Fund is managed by its general partner, SB Investment Advisers (UK) Limited, which is wholly owned by SBG.[11]

According to its website, Vision Fund's leadership is comprised of three people: Son, Ron Fisher, and Rajeev Misra.[12]  Fisher has been a director of SBG since 1997 and Vice Chairman of SBG since 2017.[13]  Fisher served on WeWork's Board from 2017 to December 31, 2019.[14]  Misra has been a member of SBG's board of directors since 2017 and an Executive Vice President of SBG since 2018.[15]  He served as a member of WeWork's Board for a few days in January 2020.[16]

## B.    The MTA and the Stockholders' Agreement

In October 2019, WeWork needed funding.[17]  On October 12, 2019, the Company's board of directors (the "Board") established a special committee comprised of two directors unaffiliated with SBG and Vision Fund (Bruce Dunlevie

---

[10] *Id.* ¶ 16.

[11] *Id.* ¶ 14.

[12] *Id.* ¶ 13.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.* ¶ 27.

5

and Lewis Frankfort) to evaluate a potential transaction with SBG (the "Special Committee").[18]

On October 22, 2019, the Company, Neumann, SBG, and Vision Fund entered into the MTA.[19] Section 2.03(b) of the MTA required the parties to enter into a stockholders' agreement (the "Stockholders' Agreement").[20]

The Stockholders' Agreement, dated as of October 30, 2019, provided for the following changes to the Company's governance structure.

- SBG and Vision Fund would have the right to designate to the Board five of the Company's ten directors, of which at least one would be designated by Vision Fund.[21]

- SBG would have the right to designate one of its directors as executive chairman of the Board.[22]

- WeWork investors Benchmark Capital and Hony Capital each would have the right to designate one director to the Board.[23]

- Shareholders other than Mr. Neumann, SBG, Vision Fund and their respective affiliates would have the right to appoint two directors to the Board.[24]

---

[18] *Id.* ¶ 6; Mot. for Status Quo Order Ex. A, Annex A (Oct. 12, 2019 Resolutions), at 1 (Dkt. 75).

[19] Compl. ¶ 2; *see* Verified Compl. Ex. A. ("MTA") (Dkt. 1).

[20] Compl. 13, n.2; MTA § 2.03(b).

[21] Compl. ¶ 30(a); MTA, Ex. I ("Shareholders' Agreement") § 2.01(b)(ii).

[22] Compl. ¶ 30(a); Shareholders' Agreement § 2.01(b)(v).

[23] Shareholders' Agreement § 2.01(b)(ii).

[24] *Id.* § 2.01(b)(iii).

6

- Special Committee member Frankfort would remain on the Board until the later of (i) the completion of the transactions under the MTA and the resolution of any litigation related to the transactions or (ii) the consummation of a tender offer provided for under the MTA, at which point WeWork's CEO, Sandeep Mathrani, would replace Frankfort on the Board.[25]

- Mr. Neumann executed a proxy giving voting control of his super-voting founder shares to the Board.[26]

As of the date of the Stockholders' Agreement, SBG and Vision Fund together owned approximately 41% to 42% of WeWork's equity, on a fully diluted basis.[27]

The MTA obligated SBG, subject to certain terms and conditions, to undertake three significant transactions to: (i) provide WeWork with $1.5 billion of equity financing (the "Equity Financing");[28] (ii) purchase up to $3 billion of WeWork stock from Neumann and other stockholders of the Company in a tender offer at a per share price of no less than $19.19 (the "Tender Offer");[29] and (iii) provide WeWork with up to $5.05 billion in debt financing (the "Debt Financing").[30]

---

[25] *Id.* § 2.01(b)(iv); Compl. ¶ 20.

[26] *See* Shareholders' Agreement § 5.08; Compl. ¶ 21.

[27] Compl. ¶¶ 10, 12, 22.

[28] *Id.* ¶ 29(a); MTA § 2.01.

[29] Compl. ¶ 29(b); MTA § 3.01(a).

[30] Compl. ¶ 29(c); MTA §§ 4.01(a)-(b).

7

Section 1.02 of the MTA spelled out the sequencing of these transactions. Specifically, Section 1.02 provided that the Equity Financing "will be the first financing transaction to occur hereunder."[31] Section 1.02 further provided that, once the Equity Financing is complete, "the Tender Offer will be commenced" and, after the Tender Offer closed, "the Debt Financing will be made available to the Company."[32] Section 4.01 of the MTA similarly provided that the Debt Financing would begin "[c]ontemporaneously with or immediately following the Tender Offer Closing Time."[33]

### C.      The ChinaCo Roll-up

The Tender Offer was subject to multiple closing conditions.[34] One such condition was the completion of a "roll up" of two of WeWork's joint ventures in Asia, known as PacifiCo and ChinaCo (together, the "JV Roll-Ups").[35] All of the conditions of the PacifiCo Roll-Up have been satisfied and that transaction is not at issue in this action.[36]

---

[31] MTA § 1.02.

[32] *Id.*

[33] *Id.* § 4.01.

[34] *See id.* § 3.01(a).

[35] Compl. ¶ 39.

[36] *See id.* ¶¶ 65-66, 70-86.

The ChinaCo Roll-Up involved a subsidiary of WeWork acquiring from Vision Fund shares in ChinaCo, a company WeWork used to conduct operations in China.[37]  In exchange for these shares of ChinaCo, Vision Fund would receive WeWork shares.[38]  The ChinaCo Roll-Up provided that "other equityholders" of ChinaCo "may participate in the JV Roll-Up."[39]  These "other equityholders" were Trustbridge Partners ("Trustbridge"), Hony Capital, and Naked Hub.[40]  To complete the ChinaCo Roll-Up, these other equityholders had to either participate in the transaction or waive their first refusal and co-sale rights.[41]

The MTA contains three provisions requiring the parties to use reasonable best efforts to complete the ChinaCo Roll-Up and other closing conditions.[42] Sections 8.03(a) of the MTA provides that SBG, Vision Fund, Neumann, and WeWork "shall . . . use their respective reasonable best efforts . . . to consummate and make effective as reasonably promptly as reasonably practicable after the date hereof . . . the Transactions."[43]  The definition of "Transactions" includes the JV

---

[37] MTA Ex. O (ChinaCo Share Purchase Agreement Term Sheet), at 1; *see* Compl. ¶ 39.

[38] MTA Ex. O at 1.

[39] *Id.*

[40] Compl. ¶ 42.

[41] MTA Ex. O at 2; *see* Compl. ¶ 46.

[42] MTA §§ 8.03(a), 8.09, 8.12.

[43] *Id.* § 8.03(a).

9

Roll-Ups.[44]    Section 8.09 of the MTA requires the same parties to use their reasonable best efforts "to enter into the Transaction Agreements," which included documents concerning the JV Roll-Ups (the "JV Roll-Up Documents").[45]  Section 8.12 of the MTA requires SBG, Vision Fund, and WeWork to use their "reasonable best efforts" to finalize the JV Roll-Up Documents no later than ten days following the funding of the Equity Financing.[46]

The Equity Financing was funded on October 30, 2019.[47]  Thus, under Section 8.12 of the MTA, the JV Roll-Up Documents needed to be finalized by November 9, 2019.[48]  On November 22, 2019 the Tender Offer commenced.[49]

### D.    Amendment No. 1 to the MTA

On December 27, 2019, the Company, Vision Fund, and SBG signed Amendment No. 1 to the MTA ("Amendment No. 1").[50]  SBG tried to convince

---

[44] *Id.* § 1.01.

[45] *Id.* §§ 8.09, 11.15; Compl. 17 n.3.

[46] MTA § 8.12; Compl. ¶ 40.

[47] Compl. ¶ 40.

[48] *Id.*

[49] *Id.* ¶ 54.

[50] *Id.* ¶ 53.

10

Neumann to sign Amendment No. 1, but when he declined to consent, his signature block was removed from the document.[51]

Amendment No. 1 included three provisions relevant to this action. First, it changed the sequencing set forth in Section 1.02 of the MTA to allow the Debt Financing to occur either "before or after" the Tender Offer closed instead of requiring that the Tender Offer close before the Debt Financing could commence.[52] Second, Amendment No. 1 changed the expiration date of the Tender Offer from "twenty (20) Business Days . . . after the date the Tender Offer is first commenced"[53] to the set time of "one minute following 11:59 p.m., New York City time, on April 1, 2020."[54] Third, Amendment No. 1 included an acknowledgement that "[e]ach Party," defined as WeWork, SBG, and Vision Fund, "caused their respective Affiliates to use reasonable best efforts to negotiate and finalize the final forms of definitive JV Roll-Up Documents, however, the JV Roll-Up Documents were not finalized within ten (10) days of the [Debt Financing] Funding."[55]

---

[51] *Id.*

[52] Verified Compl. Ex. B ("Amendment No. 1") § 3.

[53] MTA § 3.01(a).

[54] Amendment No. 1 § 2.

[55] *Id*. § 5(b).

On December 27, 2019, the same day Amendment No. 1 was signed, SBG commenced with part of the Debt Financing—before the Tender Offer had closed.[56] Under the Debt Financing, SBG committed to provide a letter of credit facility for WeWork.[57] In exchange, SBG was issued penny warrants for 129,887,919 shares of certain WeWork preferred stock.[58] These additional shares pushed SBG and Vision Fund's combined WeWork equity ownership to more than 52% on a fully diluted basis.[59] The Board at this time also held a proxy from Mr. Neumann to vote his super-voting founder shares.[60] Thus, by December 27, SBG and Vision Fund allegedly held voting and equity control over WeWork.[61]

### E. The Trustbridge Transaction and Termination of the Tender Offer

In February 2020, Vision Fund informed the Company that it was not willing to agree to the ChinaCo Roll-Up because the other equityholders also wanted to participate in the roll-up.[62]

---

[56] *Id.* ¶¶ 22, 55.

[57] *Id.* ¶ 55.

[58] *Id.*

[59] *Id.* ¶ 22.

[60] *Id.* ¶ 21.

[61] *Id.* ¶ 22.

[62] *Id.* ¶ 50.

On March 5, 2020, Trustbridge and WeWork signed a term sheet regarding the "Restructuring and Follow-On Investment" of ChinaCo (the "Trustbridge Transaction").[63] Under the terms of the Trustbridge Transaction, Trustbridge would become the majority investor in ChinaCo and Vision Fund would continue to own its shares of ChinaCo.[64] These terms differ from the terms contemplated by the ChinaCo Roll-Up by: (i) making Trustbridge, not WeWork, the majority investor in ChinaCo, and (ii) allowing Vision Fund to remain invested in ChinaCo, instead of swapping its ChinaCo ownership for new equity in WeWork.

On or about April 1, 2020, SBG terminated the Tender Offer, asserting that certain closing conditions to the Tender Offer were not satisfied.[65]

## II. PROCEDURAL HISTORY

On April 7, 2020, the Special Committee, acting on behalf of WeWork, filed a Verified Complaint in this action (C.A. No. 2020-0258-AGB) against SBG and Vision Fund asserting two claims. Count I asserts that SBG and Vision Fund breached various provision in the MTA, including their obligation to use reasonable

---

[63] *See* Houston Decl. Ex. 3 (March 5, 2020 WeWork ChinaCo Restructuring and Follow-On Investment Term Sheet) (Dkt. 160).

[64] Compl. ¶ 49.

[65] *Id.* ¶ 59; Verified Compl. Ex. C (Notice Regarding Termination and Withdrawal of Offer to Purchase Equity Securities of The We Company, dated April 1, 2020).

best efforts to consummate the JV Roll-Ups.[66] Count II asserts that SBG and Vision Fund breached their fiduciary duties as the Company's controlling stockholders.[67] On April 17, 2020, SBG and Vision Fund moved to dismiss the Special Committee's Verified Complaint.

On May 4, 2020, Neumann filed a complaint against SBG and Vision Fund in a separate action (C.A. No. 2020-0329-AGB) asserting claims for breach of contract and breach of fiduciary duties similar to those asserted in the Special Committee's Verified Complaint.

On May 28, 2020, the court entered an order consolidating the two actions for discovery and trial while maintaining separate pleadings for the different plaintiffs.[68]

On June 12, 2020, Neumann filed a Verified Amended Complaint, defined above as the "Complaint," asserting three claims. Counts I and II assert claims for breach of the MTA against SBG and Vision Fund, respectively. Count III asserts that SBG and Vision Fund breached their fiduciary duties as controlling stockholders.

---

[66] Verified Compl. ¶¶ 92, 94.

[67] *Id.* ¶ 101.

[68] *See* Dkt. 109 ¶¶ 1, 4.

14

On June 30, 2020, SBG moved to dismiss Count III of the Complaint under Rule 12(b)(6) for failure to state a claim for relief. On July 1, 2020, Vision Fund moved to dismiss Counts II and III under Rule 12(b)(6) for failure to state a claim for relief. The court heard oral argument on July 21, 2020.[69] On July 28, 2020, SBG filed a partial answer to the Complaint.[70]

## III. ANALYSIS

The standards governing a motion to dismiss under Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[71]

SBG and Vision Fund's motions to dismiss raise essentially two issues. First, does the Complaint state a breach of contract claim against Vision Fund? Second,

---

[69] The court also heard argument on July 21 on SBG and Vision Fund's motions to dismiss the Special Committee's Verified Complaint. Those motions are in abeyance pending the court's adjudication of the Company's motion for leave to dismiss the Special Committee's Verified Complaint under Court of Chancery Rule 41(a), which was argued on October 16, 2020.

[70] Dkt. 200.

[71] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal quotation marks and citations omitted).

15

does the Complaint state a breach of fiduciary duty claim against SBG and Vision Fund? The court addresses each issue in turn.

## A. The Breach of Contract Claim Against Vision Fund

Count II asserts that Vision Fund materially breached "Sections 1.02, 8.03, 8.09, 8.12, and 10.04 [of the MTA], by, among other things, amending the MTA without Plaintiffs' consent, not using its reasonable best efforts to timely finalize the JV Roll-Up Documents, and not causing the JV Roll-Ups to timely close."[72] Neumann asserts a claim against SBG for breach of the same (and some additional) contractual provisions in Count I.[73] SBG does not seek to dismiss Count I, tacitly conceding the viability of Neumann's contract claims against it. For the reasons explained below, the court finds that Plaintiffs also have stated a claim for relief concerning these contractual provisions against Vision Fund, except with respect to Section 1.02 of the MTA.

Count II consists of essentially two distinct theories of contractual liability. First, Plaintiffs assert that Vision Fund breached Sections 8.03(a), 8.09, and 8.12 of the MTA by "not using its reasonable best efforts to timely finalize the JV Roll-Up

---

[72] Compl. ¶ 83.

[73] *Id.* ¶ 73. Count I also asserts that SBG breached Sections 3.01 and 4.01 of the MTA. *Id.*

Documents, and not causing the JV Roll-Ups to timely close."[74]  Second, Plaintiffs

assert that Vision Fund breached Sections 1.02 and 10.04 of the MTA by "amending

the MTA without Plaintiffs' consent."[75]

To establish a claim for a breach of contract under Delaware law, "a plaintiff

must prove (1) the existence of a valid and enforceable contract; (2) that the

defendants breached the contract; and (3) that the plaintiff was damaged as a result

of those breaches."[76]  Vision Fund only challenges the second element, arguing that

neither alleged breach of the MTA is reasonably conceivable.[77]  The court addresses

each of Plaintiffs' theories in turn.

### 1. Reasonable Best Efforts

Sections 8.03(a), 8.09, and 8.12 of the MTA each required both SBG and

Vision Fund to use reasonable best efforts to complete the ChinaCo Roll-Up and to

satisfy other conditions to commence the Tender Offer.  Specifically, Section 8.03(a)

of the MTA states, in relevant part, that:

> The Company, SBG, [Vision Fund], [and Neumann] shall . . . use their
> respective reasonable best efforts to take, or cause to be taken, all
> actions, and to do, or cause to be done, and assist and cooperate with

---

[74] *Id.* ¶ 83.

[75] *Id.*

[76] *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, 2009 WL 1111179, at *8 (Del. Ch. Apr. 27, 2009).

[77] *See* Vision Fund Opening Br. 22-31.

17

the other Parties in doing, all things necessary, proper or advisable to cause each of . . . the Tender Offer Commencement Conditions to be satisfied as promptly as reasonably practicable after the date hereof, and to consummate and make effective as reasonably promptly as reasonably practicable after the date hereof . . . the Transactions . . . .[78]

The MTA defines the term "Transactions" to "include the [Equity Financing], the JV Roll-Ups, the Tender Offer, [and] the Debt Financing."[79]

Section 8.09 of the MTA similarly required that the parties use their reasonable best efforts to enter into "the Transaction Agreements," which included the JV Roll-Up Documents.[80] Specifically, Section 8.09 states, in relevant part, that:

Following the date hereof, the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, as promptly as possible, all things necessary, advisable or desirable, to enter into the Transaction Agreements in the agreed forms attached hereto as Exhibits to this Agreement, and negotiate in good faith, and enter into definitive documentation reflecting the terms set forth in the term sheets attached hereto as Exhibits to this Agreement.[81]

Finally, Section 8.12 of the MTA required the Company, SBG, and Vision Fund "to use reasonable best efforts to negotiate and finalize the final forms of definitive JV Roll-Up Documents by the [Equity Financing] Funding (and in any

---

[78] MTA § 8.03(a).

[79] *Id.* § 1.01.

[80] *Id.* §§ 8.09, 11.15.

[81] *Id.* § 8.09.

18

event no later than the tenth (10th) day following the date of the [Equity Financing] Funding)."[82]

Under Delaware law, reasonable best efforts clauses "impose obligations to take all reasonable steps to solve problems and consummate the transaction."[83] "When evaluating whether a merger partner has used reasonable best efforts, this court has looked to whether the party subject to the clause (i) had reasonable grounds to take the action it did and (ii) sought to address problems with its counterparty."[84]

The Complaint alleges that Vision Fund failed to use reasonable best efforts by, among other things: (i) not taking steps "to cause the China Joint Venture Roll-Up condition to be satisfied" by November 9, 2019, apart from "review[ing] drafts of proposed ChinaCo Roll-Up documentation;"[85] (ii) "fail[ing] to follow up with ChinaCo investors who wanted to discuss the transaction" to see if they would waive

---

[82] *Id.* § 8.12.

[83] *Williams Cos. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 272 (Del. 2017); *see also Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 749 (Del. Ch. 2008) (construing "covenant to use reasonable best efforts to consummate the financing" to mean that "to the extent that an act was both commercially reasonable and advisable to enhance the likelihood of consummation of the financing, the onus was on Hexion to take that act. To the extent that Hexion deliberately chose not to act, but instead pursued another path designed to *avoid* consummation of financing, Hexion knowingly and intentionally breached the covenant").

[84] *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *91 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018).

[85] Compl. ¶ 44 (internal quotation marks omitted).

their participation in the ChinaCo Roll-Up or should be allowed to participate in it;[86] (iii) "pursuing an alternative financing transaction with Trustbridge" "[i]nstead of using reasonable best efforts to negotiate and finalize the ChinaCo Roll-Up;"[87] and (iv) failing to use its "leverage . . . to structure the transaction in a way that would have permitted the ChinaCo Roll-Up to precede the ChinaCo recapitalization."[88]

Vision Fund counters "it is not reasonably conceivable that Vision Fund thwarted the ChinaCo Roll-Up" because it "had every incentive to complete the ChinaCo Roll-Up."[89] Vision Fund further contends that Plaintiffs "simply ignore[] all the other actions Vision Fund took to complete both JV Roll-Ups."[90] Those actions include:

> (i) agreeing to Amendment No. 1 to, among other things, extend the date to complete the JV Roll-Up Condition given that the date had passed; (ii) negotiating and agreeing to Amendment No. 2 to resolve the ChinaCo Roll-Up Condition when it became obvious to the Company and the Special Committee that the transaction could not be completed; (iii) making antitrust filings needed to complete the JV Roll-Ups; (iv) agreeing to a multi-step share exchange to complete the PacificCo Roll-Up; and (v) executing the PacificCo Roll-Up.[91]

---

[86] *Id.* ¶ 46.

[87] *Id.* ¶ 47.

[88] *Id.* ¶ 49.

[89] Vision Fund Opening Br. 23-24 (internal quotation marks omitted).

[90] *Id.* at 25.

[91] *Id.* at 25-26. Sometime after Amendment No. 1 was executed, the Special Committee proposed a second amendment to the MTA, which the parties refer to as "Amendment No. 2." Compl. ¶ 51. Under Amendment No. 2, Vision Fund would have been allowed to

The fundamental problem with Vision Fund's motion is that it implicates numerous factual disputes that cannot be resolved at the pleadings stage.[92] This is evident from Vision Fund's own briefs. Vision Fund argues, for example, that Plaintiffs' "allegation that Vision Fund pursued the Trustbridge deal rather than exercising reasonable best efforts . . . *is contradicted* by the other allegations and facts" that Vision Fund asks the court to consider and credit in its favor.[93]

As another example, Vision Fund argues that Plaintiffs' "fanciful tale that Vision Fund pursued the Trustbridge 'sweetheart' deal rather than take reasonable best efforts to close the ChinaCo Roll-Up *is contradicted* by the very documents on which the allegations are based," namely that the "Trustbridge term sheet shows that WeWork—not Vision Fund—agreed to the Trustbridge transaction."[94] This begs the question: why did WeWork sign the Trustbridge term sheet? At a minimum, a

---

maintain its equity interest in ChinaCo while still receiving shares in WeWork (equivalent to about 8% of the Company's stock) that it would have received if the ChinaCo Roll-Up had proceeded as originally planned under the MTA. *Id.* Amendment No. 2 never became effective.

[92] *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001) ("Because a motion to dismiss under Chancery Rule 12(b)(6) must be decided without the benefit of a factual record, the Court of Chancery may not resolve material factual disputes; instead, the court is required to assume as true the well-pleaded allegations in the complaint.").

[93] Vision Fund Reply Br. 14 (emphasis added).

[94] Vision Fund Opening Br. 27 (emphasis added) (citing Compl. ¶¶ 47-49).

triable issue exists as to whether WeWork supported the Trustbridge Transaction at the behest of SBG and Vision Fund—acting in concert—to evade SBG's obligation to complete the Tender Offer.[95] This scenario is reasonably conceivable, particularly given the allegations in the Complaint that SBG and Vision Fund acquired voting and equity control over WeWork.[96]

The existence of factual disputes is amplified by Vision Fund's request that the court consider for truth a number of documents outside of the Complaint. For example, the Complaint refers to Vision Fund's response to an interrogatory to explain that the efforts Vision Fund made in October and November 2019 concerning the ChinaCo Roll-Up consisted of reviewing drafts of documents and

---

[95] Vision Fund argues that "allegations of control are not relevant to a breach of contract claim." Vision Fund Reply Br. 4. To support this sweeping assertion, Vision Fund cites three cases. None of the cited cases involved an efforts clause and none stand for the proposition that actions of a control group are entirely irrelevant when considering whether members of the group breached a contract they signed. *CMS Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *13 (Del. Ch. June 23, 2015) (finding allegation that defendant "held substantial membership interests" insufficient to support a claim that the defendant breached an LLC agreement, where the defendant did not sign the LLC Agreement); *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 194 (Del. Ch. 2014) (holding that "Delaware law generally does not recognize a claim for aiding and abetting a breach of contract"); *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *22 (Del. Ch. Nov. 26, 2014) (finding that "civil conspiracy and aiding and abetting are quite similar" in the context of a fraud claim). In my view, whether SBG and Vision Fund acted in concert as a factual matter to evade SBG's obligation to complete the Tender Offer is highly relevant to determining as a legal matter whether they violated their respective obligations to use reasonable best efforts under the MTA.

[96] Compl. ¶ 22.

22

communicating regularly with the Company.[97] Based on this reference, Vision Fund asks the court to consider for its truth another part of the response that characterizes the Company's analysis of various legal issues that are not mentioned in the Complaint and that Plaintiffs had not had the opportunity to test in discovery as of the date of the Complaint.[98] Doing so would far exceed the boundaries of the incorporation by reference doctrine[99] and turn on their head foundational principles governing adjudication of a pleadings stage motion by asking the court to draw inferences in favor of the defendant rather than the plaintiff.[100]

---

[97] *Id.* ¶¶ 44-45.

[98] Vision Fund Opening Br. 10 n.4, 25. Specifically, the part of the interrogatory response Vision Fund relies on explains that "the Company's analysis with respect to the Foreign Investment Real Property Tax Act ("FIRPTA") and its potential status as a U.S. Real Property Holding Corporation and antitrust related considerations became the focus of discussions, delaying progress on the ChinaCo Roll-Up documentation." Wade Decl. Ex. 2 (Excerpts of Vision Fund's Responses and Objections to Plaintiffs' First Set of Interrogatories) at 51 (Dkt. 160).

[99] *See Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020) ("The incorporation-by-reference doctrine does not enable a court to weigh evidence on a motion to dismiss. It permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one. The doctrine limits the ability of a plaintiff to take language out of context, because the defendants can point the court to the entire document.") (internal citations omitted).

[100] *Id.* (finding a defendant's "[a]ssertions that the process was 'thoughtful and proper,' the investigation and examination 'careful,' the transaction 'free of influence,' and the negotiations 'robust'" were "characterizations that would require drawing inferences in favor of the defendants.").

Determining whether a party used reasonable best efforts is an inherently factual inquiry that is not readily amenable to resolution at the pleadings stage.[101] There are exceptions,[102] but this case is not one of them. Here, Vision Fund's motion impermissibly asks the court to consider evidence outside of the Complaint, to weigh evidence, and to draw inferences in its favor.[103] Accepting as true the well-pled allegations of the Complaint and drawing all reasonable inferences in Plaintiffs' favor, as the court must at this stage, Count II states a reasonably conceivable claim that Vision Fund breached its reasonable best efforts obligations in Sections 8.03(a), 8.09, and 8.12 of the MTA. Accordingly, the court denies Vision Fund's motion to dismiss this aspect of Count II.

[101] *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.*, 2013 WL 5787958, at *6 (Del. Ch. Oct. 25, 2013) (noting that a party did not move for judgment on the pleadings on a breach of contract claim involving reasonable best efforts, and that "it could not successfully do so" because such an argument "would present an issue of fact not amenable to such a motion"); *see also Crum & Crum Enters., Inc. v. NDC of Cal., LP*, 2010 WL 4668456, at *5 (D. Del. Nov. 3, 2010) ("[A] determination of best efforts is a fact intensive inquiry that is appropriately reserved for the factfinder."); *Brown v. Buschman Co.*, 2002 WL 389139, at *85 (D. Del. Mar. 12, 2002).

[102] *See, e.g., Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *16 (Del. Ch. Feb. 27, 2020) (dismissing as not reasonably conceivable a claim for breach of a commercially reasonable efforts covenant contractually defined to include "an objective metric—comparable industry standards—rather than the buyer's subjective intent or state of mind.").

[103] *Voigt*, 2020 WL 614999, at *26 ("Assessing these justifications would require factual assessments that the court cannot make at the pleading stage. Crediting the defendants' arguments would require drawing inferences in favor of the defendants, rather than the plaintiff.").

## 2. Amendment No. 1 to the MTA

Section 1.02 of the MTA, titled "Sequencing of Financing Transactions," provides that the Equity Financing, the Tender Offer, and the Debt Financing were to occur in that order:

> [The Equity Financing] will be the first financing transaction to occur hereunder.  Following the [Equity Financing], and subject to the terms and conditions set forth or referenced in <u>Article III</u>, the Tender Offer will be commenced and the Equity Securities tendered thereunder shall be accepted for purchase.  Following the acceptance of Equity Securities for purchase by [SBG or its designee] in the Tender Offer, the Debt Financing will be made available to the Company . . . .[104]

Consistent with this sequence, Section 4.01 of MTA provides that the Debt Financing would occur "[c]ontemporaneously with or immediately following the Tender Offer Closing Time."[105]  The MTA defines the "Tender Offer Closing Time" to mean "[t]he time at which [SBG or its designee] irrevocably accepts for purchase Equity Securities tendered in the Tender Offer."[106]

On December 27, 2019, SBG, Vision Fund, and the Company signed Amendment No. 1 to the MTA, which changed the sequencing reflected in Sections 1.02 and 4.01 to permit the Debt Financing to occur before the Tender Offer

---

[104] MTA § 1.02.

[105] *Id.* § 4.01.

[106] *Id.* § 3.01(c).

closed.[107]  Specifically, Amendment No. 1 purported to add a new subsection to Section 4.01, which states as follows:

> Notwithstanding any other provision of this Agreement to the contrary, SBG and the Company may agree in writing . . . that any or all of the amounts to be made available pursuant to the Debt Financing may be made available at a time to be mutually agreed in such writing, *which may be before or after the Tender Offer Closing Time*.[108]

Plaintiffs argue that Vision Fund breached Section 10.04 of the MTA by failing to obtain Plaintiffs' consent to Amendment No. 1.  That provision states, in relevant part, that:

> This Agreement may not be amended except by an instrument in writing signed on behalf of the Company, [Neumann, Vision Fund] and SBG; *provided, however, that any amendment to the Agreement that does not change the terms (including, without limitation, the economic benefit) of the Transactions to [Neumann] shall not require the consent of [Neumann]*.[109]

The structure of Section 10.04 is straightforward.  The first part embodies the basic principle of contract law that the consent of all parties to a contract is necessary to amend the contract.[110]  The second part, italicized above, contains an exception when

---

[107] Compl. ¶ 53; *see* Amendment No. 1 § 3.

[108] Amendment No. 1 § 3 (emphasis added).

[109] MTA § 10.04.

[110] *Josloff v. Falbourn*, 125 A. 349, 349 (Del. 1924) ("It is well settled, that one of the parties to a contract cannot modify such contract or terminate it lawfully unless the other party assents thereto."); *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1232 (Del.

26

an amendment "does not change the terms . . . of the Transactions" as to Neumann. It is logical that Section 10.04 would contain such an exception because not all provisions of the MTA affect Neumann's contractual rights and obligations. The indemnification provision in Section 11.02(b) of the MTA is one example.[111]

According to Neumann, "Amendment No. 1 not only changed the terms of the transactions relating to Neumann, but also financially harmed him in allowing SBG and [Vision Fund] to obtain the benefits of their bargain (the Debt Financing) while depriving Neumann of his economic benefit (the Tender Offer)."[112] Vision Fund makes essentially two arguments in response, neither of which carries the day.

First, Vision Fund contends that "Amendment No. 1 did not change the sequencing" of the Transactions but "merely provided that SBG and the Company could later agree to reorder the sequencing."[113] This is literally true, but it does not negate the fact that Vision Fund agreed with SBG and the Company to modify the express terms of the MTA to permit something that the MTA did not permit before— commencing the Debt Financing before the Tender Offer closed—without obtaining

---

Ch. 2000) ("Any amendment to a contract, whether written or oral, relies on the presence of mutual assent and consideration.").

[111] MTA § 11.02(b) (describing WeWork's obligations "to indemnify and hold harmless the SoftBank Entities," which, as defined, does not include Plaintiffs).

[112] Pls.' Opp'n Br. 46.

[113] Vision Fund Opening Br. 29.

Neumann's consent. Thus, Amendment No. 1 was a breach of Section 10.04 of the MTA unless it falls within the exception in Section 10.04.

Second, Vision Fund argues that "Amendment No. 1 did not change any terms of the Transactions concerning Neumann or any of the benefits he was to receive."[114] In other words, Vision Fund argues that Amendment No. 1 unequivocally falls within the exception in Section 10.04. The court disagrees.

In my view, without ruling out that the language of the exception in Section 10.04 may be susceptible to more than one reasonable interpretation, the exception can reasonably be interpreted to mean that changing Neumann's rights with respect to the Transactions is impermissible without obtaining his consent. The terms in Sections 1.02 and 4.01 of the MTA addressing the timing of the Debt Financing relative to the Tender Offer, furthermore, reasonably can be viewed as affecting Neumann's rights with respect to the Tender Offer. This is so because those timing provisions provided Neumann the right to obtain liquidity by tendering his shares into the Tender Offer before WeWork and SBG commenced the Debt Financing. That right was meaningful, as the Complaint plausibly alleges, because SBG stood to receive certain benefits in connection with the Debt Financing, namely: (i) penny warrants for more WeWork stock, (ii) capital for WeWork to "protect[] SBG and

---

[114] *Id.* at 30.

[Vision Fund]'s multi-billion-dollar WeWork investment," and (iii) increased control over WeWork—but only if SBG honored its obligation to close the Tender Offer first.[115] For these reasons, the second aspect of Count II states a reasonably conceivable claim for relief against Vision Fund for breach of Section 10.04 of the MTA.

Finally, in what appears to be a side issue, Vision Fund contends it could not have breached Section 1.02 because it "has no obligations regarding the sequencing or financing of the MTA Transactions."[116] Plaintiffs do not contend otherwise, nor could they since it was the obligation of SBG or its designee to undertake the Equity Financing, the Tender Offer, and the Debt Financing.[117]

The gravamen of Plaintiffs' position appears to be that Vision Fund breached Section 10.04 by approving Amendment No. 1 without Neumann's consent, which allowed SBG to deviate from the timing sequence specified in Sections 1.02 and 4.01 of the MTA. This states a claim for relief for the reasons discussed above. That said, the Complaint literally asserts that Vision Fund "breached" Section 1.02.[118] This aspect of Count I, which is inconsequential to the gravamen of the claim, fails

---

[115] Compl. ¶ 35.

[116] Vision Fund Opening Br. 29.

[117] *See* MTA §§ 2.01, 3.01(a), 4.01(a)-(b).

[118] Compl. ¶ 83.

to state an independent basis for a breach of contract claim against Vision Fund because it owed no obligations under Section 1.02.

* * * * *

For the reasons explained above, Vision Fund's motion to dismiss Count II is granted as to Section 1.02 and denied as to Sections 8.03(a), 8.09, 8.12, and 10.04.

### B.    The Fiduciary Duty Claim

Count III of the Complaint asserts that SBG and Vision Fund breached their fiduciary duties as a control group to Plaintiffs as WeWork stockholders.[119] Neumann advances this argument only with respect to conduct of SBG and Vision Fund occurring after they entered into the MTA and the Stockholders' Agreement.

SBG and Vision Fund both have moved to dismiss Count III for failure to state a claim for relief on the theory that "Count III merely duplicates the claims for breach of contract against SBG (Count I) and SVF (Count II)."[120] Vision Fund also argues it does not owe fiduciary duties as a stockholder of WeWork or as part of a control group with SBG.[121] SBG disputes it was a controlling stockholder of

---

[119] Compl. ¶¶ 88-89.

[120] SBG Opening Br. 5; *see* Vision Fund Opening Br. 32.

[121] *See* Vision Fund Opening Br. 35-40.

WeWork after it entered into the MTA, "but that disagreement does not form a part of SBG's motion to dismiss."[122]

Although the Complaint alleges facts to support a compelling case at the pleadings stage that SBG and Vision Fund owed fiduciary duties to WeWork's other stockholders as a control group after entering into the MTA and the Stockholders' Agreement, [123] the court does not need to reach that question. Even assuming that SBG and Vision Fund owed fiduciary duties to the Company's other stockholders, the court concludes that Neumann's claim for breach of fiduciary duty must be dismissed because it is duplicative of his breach of contract claims.

In *Nemec v. Shrader*,[124] our Supreme Court recognized the "well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim," and "any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous."[125] About four months later, in *Grayson v. Imagination Station*, the Court of Chancery summarized the principles relevant to

---

[122] SBG Opening Br. 6 n.5.

[123] *See* Compl. ¶¶ 12-22 (alleging facts regarding the substantial ties between Vision Fund and SBG and their collective control over WeWork).

[124] 991 A.2d 1120 (Del. 2010).

[125] *Id.* at 1129 (citing *Blue Chip Cap. Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827, 833 (Del. Ch. 2006) and *Gale v. Bershad*, 1998 WL 118022, at *5 (Del. Ch. Mar. 4, 1998)).

determining when a claim for breach of fiduciary duty should be dismissed as duplicative, as follows:

> Under Delaware law, if the contract claim addresses the alleged wrongdoing by the [fiduciary], any fiduciary duty claim arising out of the same conduct is superfluous.  The reasoning behind this is that to allow a fiduciary duty claim to coexist in parallel with a contractual claim, would undermine the primacy of contract law over fiduciary law in matters involving . . . contractual rights and obligations.  Nevertheless, Delaware law does recognize a narrow exception under which breach of contract and breach of fiduciary duty claims can both arise from the same nucleus of operative facts.  Where there is an independent basis for the fiduciary duty claims apart from the contractual claims, even if both are related to the same or similar conduct . . . the fiduciary duty claims will survive.[126]

"To determine whether there is an independent basis for fiduciary claims arising from the same general events, the Court inquires whether the fiduciary duty claims depend on additional facts . . . are broader in scope, and involve different considerations in terms of a potential remedy."[127]  Applying these principles, this court has dismissed fiduciary duty claims as duplicative of contract claims on many occasions.[128]

---

[126] 2010 WL 3221951, at *7 (Del. Ch. Aug. 16, 2010) (internal quotation marks, alterations, and citations omitted).

[127] *Edinburgh Hldgs., Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *15 (Del. Ch. June 6, 2018) (quoting *Renco Gp., Inc. v. MacAndrews AMG Hldgs, Inc.*, 2015 WL 394011, at *7 (Del. Ch. Jan. 29, 2015)).

[128] *See, e.g.*, *id.*; *Renco*, 2015 WL 394011, at *7-8; *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *18-19 (Del. Ch. Sept. 18, 2014); *Stewart v. BF Bolthouse Holdco, LLC*, 2013 WL 5210220, at *13-15 (Del. Ch. Aug. 30, 2013); *Grayson*, 2010 WL 3221951, at

Neumann contends his claim for breach of fiduciary duty is not duplicative because it "is broader than, and independent of, the breach of contract claims" and "the fiduciary duty claims arise independently of the duties imposed" by the MTA.[129] For support, Neumann relies on paragraphs 57 and 89 of his Complaint.[130] They state in their entirety that:

> SBG's and SBVF's actions also showed a disregard for their fiduciary duty to be candid with the Special Committee and Plaintiffs and to fully disclose that SBG was pursuing a transaction contrary to a Tender Offer Closing Condition at the same time that SBG negotiated the MTA amendment, and at the same time that SBG and SBVF were asking the parties to confirm that they had been complying with their promise to use reasonable best efforts to meet the closing conditions.[131]

> \* \* \* \* \*

> SBG and SBVF have exercised their control to the detriment of Plaintiffs. Independent of whether Mr. Neumann was required to sign the Amendment, SBG and SBVF violated their duties to Plaintiffs by,

---

*7-8; *Grunstein v. Silva*, 2009 WL 4698541, at *5-7 (Del. Ch. Dec. 8, 2009); *Solow v. Aspect Res., LLC*, 2004 WL 2694916, at *4-5 (Del. Ch. Oct. 19, 2004); *Madison Realty P'rs 7, LLC v. AG ISA, LLC*, 2001 WL 406268, at *6 (Del. Ch. Apr. 17, 2001).

[129] Pl.'s Opp'n Br. 17, 19 (internal quotation marks omitted).

[130] *See id.* at 20.

[131] Compl. ¶ 57 (emphasis in original omitted). The allegation in paragraph 57 that "SBG and SBVF were asking the parties to confirm that they had been complying with their promise to use reasonable best efforts to meet the closing conditions" appears to refer to Section 5(b) of Amendment No. 1, which states, in part, that "[e]ach Party hereby acknowledges that the Company, SBG and SBVF caused their respective Affiliates to use reasonable best efforts to negotiate and finalize the final forms of definitive JV Roll-Up Documents." *See* Compl. ¶ 54; Amendment No. 1 § 5(b). As explained previously, Neumann refused to consent to Amendment No. 1.

among other things, restructuring the sequence of transactions in the MTA, relieving themselves of the obligation to complete the Tender Offer in order to engage in the Debt Financing with WeWork, and misrepresenting and concealing material information regarding SBG and SBVF's failure to use best efforts to close the China Joint Venture. SBG and SBVF exercised the control that they received over WeWork to preserve the value of their WeWork investment, while at the same time depriving Plaintiffs of the primary economic benefit Plaintiffs were supposed to receive—the Tender Offer. SBG's and SBVF's violation of their fiduciary duties to Plaintiffs is magnified by the fact that Plaintiffs gave up valuable governance rights in the MTA and related transactions, and are burdened by an ongoing requirement to vote shares in favor of the SBG-and-SBVF controlled Board. It is improper for SBG and SBVF to retain the benefits of the MTA and use those benefits to then breach the fiduciary duties that SBG and SBVF owe to Plaintiffs.[132]

Paragraphs 57 and 89 demonstrate that Neumann's fiduciary duty claims correspond to his claims for breach of contract based on specific provisions in the MTA. For example, the reference in paragraph 89 to "restructuring the sequence of transactions in the MTA" relates directly to Neumann's contention, discussed in Part III.A.2, that SGB and Vision Fund breached Section 10.04 of the MTA by entering into Amendment No. 1 without his consent. Similarly, the references in paragraphs 57 and 89 to SBG and Vision Fund (i) pursuing the Trustbridge Transaction "at the same time that SBG negotiated the MTA amendment" and (ii) "misrepresenting and concealing material information regarding SBG and SBVF's failure to use best

---

[132] Compl. ¶ 89.

34

efforts to close the China Joint Venture," relate directly to Neumann's contention, discussed in Part III.A.1, that SBG and Vision Fund breached their reasonable best efforts obligations under Sections 8.03(a), 8.09, and 8.12 of the MTA.

Neumann argues that his allegations about SBG and SBVF's "*deceit*" concerning the Trustbridge Transaction "go far beyond the duties governed by the MTA."[133] He further contends that "[e]ven if the Court were to determine that SBG and SBVF did not breach Section 10.04 of the MTA by amending the MTA without [Neumann's] consent, it would remain the case that SBG and SBVF" breached their fiduciary duties by "us[ing] their control and deceit to create a result that was in their best interests, but that disregarded the best interest of Plaintiffs and other minority shareholders."[134] These contentions are long on rhetoric but short on factual allegations to support an independent basis for a fiduciary duty claim.

As previously noted, when determining whether a party has used reasonable best efforts, this court considers whether the party communicated with and "sought to address problems with its counterparty."[135] Our courts have found compliance with an efforts clause when the record reflects meaningful evidence of such

---

[133] Pl.'s Opp'n Br. 21.

[134] *Id.* (internal quotation marks and alteration omitted).

[135] *Akorn*, 2018 WL 4719347, at *91.

communications[136] and noncompliance when it does not.[137] Under Delaware law,

controlling stockholders owe the same fiduciary duty of disclosure as directors[138]

---

[136] *Id.* at \*93 (holding that buyer did not breach a "commercially reasonable efforts" clause in part because the buyer "communicated directly with [seller] about its performance" and flew executives to seller's headquarters "to meet in person with" seller's CEO and other executives).

[137] *Channel Medsystems, Inc. v. Boston Sci. Corp.*, 2019 WL 6896462, at \*38 (Del. Ch. Dec. 18, 2019) (finding that buyer failed to use "reasonable best efforts" because it: (i) "made no reasonable efforts to engage with" its counterparty "or to take other appropriate actions to attempt to keep the deal on track after" receiving a critical report and (ii) terminated the merger agreement "without ever . . . raising any concerns, or seeking to communicate with" a regulatory firm brought in to perform an independent review of seller "or . . . engaging any outside experts to analyze [seller]'s clinical data, [or] its quality system"); *Hexion*, 965 A.2d at 730, 750 (criticizing buyer for "the deliberate decision not to consult with [seller] regarding the [solvency] analysis prior to filing the lawsuit" and finding that, after buyer formed a good faith belief that the merger would result in the combined entity being insolvent, it "had an absolute obligation to notify [seller] of this concern" because of a reasonable best efforts clause, but instead, the buyer "did nothing to approach [seller's] management, either to discuss ways the solvency problems might be addressed, or even to put [seller] on notice of its concerns").

[138] *Lynch v. Vickers Energy Corp.*, 351 A.2d 570, 573 (Del. Ch. 1976) ("[T]here is no doubt but that in situations in which the holder of a majority of the voting shares of a corporation, as here, seeks to impose its will upon minority stockholders, the conduct of such majority must be tested by those same standards of fiduciary duty which directors must observe in their relations with all their stockholders.") *rev'd on other grounds*, 383 A.2d 278 (Del. 1977); *Malone v. Brincat*, 722 A.2d 5, 11 n.21 (Del. 1998) (citing *Lynch* for the proposition that a "majority stockholder bears burden of showing full disclosure of all facts within its knowledge that are material to stockholder action" and holding that "[t]he fiduciary duty of disclosure is also applicable . . . to less-than-majority shareholders who control or affirmatively attempt to mandate the destiny of the corporation"); *In re Wayport, Inc. Litig.*, 76 A.3d 296, 319 (Del. Ch. 2013) (citing *Lynch* for the proposition that controllers owe the same duty of disclosure as directors).

and those duties arise as a general matter when (i) "seeking shareholder action"[139] or (ii) "communicat[ing] publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action."[140] Neither scenario applies here, where Neumann's grievance concerns alleged acts of concealment. Significantly, Neumann cites no authority to support the proposition that SBG and SBVF owed a broader duty as fiduciaries to disclose information affirmatively to him as a stockholder than they had as a contractual counterparty to comply with their obligations to use reasonable best efforts under the MTA.[141] Thus, Neumann's fiduciary duty claim is not broader in scope than his contract claim under the MTA.

---

[139] *Kahn v. Roberts*, 679 A.2d 460, 467 (Del. 1996); *see also Wayport*, 76 A.3d at 314-15; 2 DENNIS J. BLOCK ET AL., THE BUSINESS JUDGMENT RULE: FIDUCIARY DUTIES OF CORPORATE DIRECTORS 1720-22 (6th ed. 2009).

[140] *Malone*, 722 A.2d at 10; *see also* BLOCK, *supra*, at 1719, 1723-24.

[141] Neumann cites *PT China LLC v. PT Korea LLC*, 2010 WL 761145, at *7 n.36 (Del Ch. Feb. 26, 20101) for the proposition that allegations of "deceit go far beyond the duties governed by the MTA." Pls.' Opp'n Br. 21 (emphasis in original omitted). That case is inapposite. In *PT China*, the court recognized "due to the primacy of contract law" that "a contractual claim will preclude a fiduciary duty claim, so long as the duty sought to be enforced arises from the parties' contractual relationship." *Id.* at *7 (internal quotation marks omitted). The court allowed fiduciary duty claims for usurpation of corporate opportunities and misappropriation of company funds—claims that are actionable without a contract—to proceed "because no argument has been made that these duties are limited in any way by" the operative contracts or the company's "governing documents." *Id.* Neumann, in contrast, has failed to plead adequately any actionable claim that does not completely overlap with obligations owed under the MTA.

37

Turning to the other factors relevant to determining if an independent basis exists for a fiduciary duty claim, Neumann does not identify any additional facts relevant to his fiduciary duty claim but not his contract claim. This is unsurprising given that the same facts concerning the failure to complete the ChinaCo Roll-Up—including the effectuation of the Trustbridge Transaction—are at the heart of both claims. Finally, Neumann does not contend that the fiduciary duty claim involves different considerations than the contract claim in terms of a potential remedy.

In sum, the Company, Neumann, SBG, and Vision Fund chose to govern their relationship with a complex negotiated contract—the MTA. Based on the allegations of the Complaint, Plaintiffs' breach of fiduciary duty claim is not broader in scope, does not rely on any additional facts, and does not seek any relief not sought for breach of the MTA. No independent basis thus exists to maintain the claim for breach of fiduciary duty.[142] Accordingly, Count III of the Complaint fails to state a claim for relief and will be dismissed.

---

[142] Plaintiffs misplace reliance on *2009 Caiola Fam. Tr. v. PWA, LLC,* 2014 WL 7232276 (Del. Ch. Dec. 18, 2014) and *RJ Assocs., Inc. v. Health Payors' Org. Ltd. P'ship, HPA, Inc.*, 1999 WL 550350 (Del. Ch. July 16, 1999). In *Caiola*, defendants allegedly breached certain duties concerning the management of an LLC in ways that were not covered by the terms of the LLC's operating agreement. 2014 WL 7232276, at *9. In *RJ Associates*, the court simply acknowledged that "[c]onduct by an entity that occupies a fiduciary position . . . may form the basis of both a contract and a breach of fiduciary duty claim," where a partnership agreement provided that a breach of the contract also would be a breach of

## IV. CONCLUSION

For the reasons explained above, SBG's motion to dismiss Count III is GRANTED and Vision Fund's motion to dismiss Counts II and III is GRANTED in part, and DENIED in part.

**IT IS SO ORDERED.**

---

fiduciary duty. 1999 WL 550350, at *10 & n.36. The circumstances of these cases are not present here.